## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **JOHN NICHOLAS SNIDER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CIV-24-059-RAW-SPS** |
| | ) | |
| **MICHELLE A. KING,** | ) | |
| **Acting Commissioner of the** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

The claimant John Nicholas Snider, requests judicial review of a denial of benefits by the Commissioner of the Social Security Administration pursuant to 42 U.S.C. § 405(g).  He appeals the Commissioner's decision and asserts that the Administrative Law Judge ("ALJ") erred in determining he was not disabled.  For the reasons discussed below, the Magistrate Judge recommends the Commissioner's decision be AFFIRMED.

## I.    Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[.]" 42 U.S.C. § 423(d)(1)(A).  A claimant is disabled under the Social Security Act "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id*.

§ 423 (d)(2)(A). Social security regulations implement a five-step sequential process to evaluate a disability claim. *See* 20 C.F.R. §§ 404.1520, 416.920.[1]

Section 405(g) limits the scope of judicial review of the Commissioner's decision to two inquiries: whether the decision was supported by substantial evidence and whether correct legal standards were applied. *See Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). *See also Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). The Court may not reweigh the evidence or substitute its discretion for the Commissioner's. *See Casias v. Secretary of Health & Human Services*, 933 F.2d 799, 800 (10th Cir. 1991). But the Court must review the record as a whole, and "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). *See also Casias*, 933 F.2d at 800-01.

---

[1] Step one requires the claimant to establish that he is not engaged in substantial gainful activity. Step two requires the claimant to establish that he has a medically severe impairment (or combination of impairments) that significantly limits his ability to do basic work activities. If the claimant *is* engaged in substantial gainful activity, or his impairment *is not* medically severe, disability benefits are denied. If he *does* have a medically severe impairment, it is measured at step three against the listed impairments in 20 C.F.R. Part 404, Subpt. P, App. 1. If the claimant has a listed (or "medically equivalent") impairment, he is regarded as disabled and awarded benefits without further inquiry. Otherwise, the evaluation proceeds to step four, where the claimant must show that he lacks the residual functional capacity ("RFC") to return to his past relevant work. At step five, the burden shifts to the Commissioner to show there is significant work in the national economy that the claimant *can* perform, given his age, education, work experience, and RFC. Disability benefits are denied if the claimant can return to any of his past relevant work or if his RFC does not preclude alternative work. *See generally Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

## II.    Background and Procedural History

Claimant was born on October 16, 1981, and was 40 years old on the alleged disability onset date. (Tr. 33).  He was 42 years old at the time of the most recent administrative hearing. (Tr. 44). He has completed high school and has past relevant work experience as a general manager and military officer. (Tr. 32). Claimant asserts he has been unable to work since November 10, 2021. (Tr. 19, 158).

Claimant applied for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act) in 2022. (Tr. 155-59). The ALJ's decision denying his application became the Commissioner's final decision when the agency's Appeals Council denied his request for review. (Tr. 17-34).

## III.    Decision of the Administrative Law Judge

The ALJ made her decision at step five of the sequential evaluation.  At step two, the ALJ found that Claimant had severe impairments including posttraumatic stress disorder (PTSD); depressive disorder; anxiety disorder, with related tremors/tic disorder; osteoarthritis and tendinopathy of the right shoulder, status post arthroscopy. (Tr. 20). The ALJ also found Claimant suffered from the nonsevere impairment of obesity. *Id.*

Next, she found that Claimant's impairments did not meet a listing. *Id.* At step four, she found that Claimant was unable to perform any past relevant work, but retained "the residual functional capacity ("RFC") to perform less than the full range of medium work with the following qualifications:

> Over the course of an 8-hour workday with standard (i.e., morning, lunch and afternoon, or the equivalent) work breaks, he can lift, carry, push and pull up to 50 pounds occasionally and 25 pounds frequently; sit 6 hours; stand and walk for a combined total of 6 hours; never climb ladders, ropes or scaffolds or otherwise work at unprotected heights; not perform work involving commercial

> driving or operating heavy machinery; with the right upper
> extremity, can reach frequently but not constantly; and handle and
> finger frequently but not constantly with the bilateral upper
> extremities. He can work in no more than a moderate noise
> environment. He can sustain attention and concentration for simple
> work tasks and make simple work-related decisions; occasionally
> interact with coworkers and supervisors for incidental work
> purposes, but not work with the public or perform team or tandem
> tasks; and deal with occasional changes in a routine work setting.

(Tr. 22). At step five, the ALJ found that this RFC would allow Claimant to perform other work

existing in significant numbers in the national economy. (Tr. 34). The ALJ thus concluded that

Claimant was not disabled under the Act. *Id.*

## IV.   Review

After careful review, the Court summarizes the medical evidence pertinent to the

arguments made herein.[2] The relevant evidence before the ALJ regarding Claimant's physical

severe impairment of right shoulder osteoarthritis and tendinopathy reflect that Claimant presented

to the emergency department with right shoulder pain in June 2023. (Tr. 939). He acknowledged

a right torn labrum 10-15 years earlier developed while camping in the Tetons. *Id.* He declined to

have it repaired at that time as he was in active duty and that it would have impacted his ability to

do his job. *Id.*

An x-ray of his right shoulder showed abnormal ossific density to the proximal neck of the

right humerus, chronic in appearance. (Tr. 939-42). Magnetic resonance imaging (MRI) of the

right shoulder showed an ossific body likely from remote traumatic changes, mild subscapularis

tendinopathy with mild articular surface fraying, mild tenosynovitis involving the long head of the

---

[2] The ALJ thoroughly examined the medical evidence of record over the course of five, single-
spaced pages. (Tr. 25-29).

biceps, mild supraspinatus and infraspinatus tendinopathy, very mild degenerative changes involving the acromioclavicular joint, and trace volume glenohumeral joint effusion. (Tr. 891-92).

In September 2023, Claimant underwent a right shoulder arthroscopy with extensive glenohumeral debridement; open reduction internal fixation of a chronic, non-united lesser tuberosity fracture; and right open biceps tenodesis. (Tr. 1043-44). When seen for a two-week follow up, Claimant was doing well, denied any significant pain or problems (pain rated only 2/10 in severity), his incision was healing appropriately, and imaging confirmed healing with underlying rotator cuff degeneration/tear. (Tr. 883-85). Claimant was continued in a sling and was referred to physical therapy. (Tr. 885). At an October 2023 psychiatry follow up, Claimant reported his shoulder "still hurts quite a bit" following surgery and attributed his irritable mood to the same. (Tr. 901). However, he also reported his sleep was good and his family life was going well. *Id.* He was future oriented, and medication compliant. (Tr. 901-902).

The state agency medical consultants offered their opinions prior to Claimant receiving treatment for his right shoulder, but based on tremors resulting from his mental impairments, they found Claimant could perform the full range of medium work. (Tr. 80-81, 89-90).

Regarding Claimant's mental impairments, the ALJ found Claimant sought treatment on October 14, 2021, when he reported increased stress, anxiety, depression, and insomnia mostly related to his job managing a travel center. (Tr. 551). At that time, mental status examination indicated he was dressed appropriately with adequate hygiene and grooming. He was pleasant and cooperative, with no abnormal behaviors and there were no abnormal or involuntary movements. His speech was normal, with thought processes/content clear, linear and goal directed. He denied psychosis as well as auditory/visual hallucinations and it was noted he did not appear to be responding to internal stimuli. In addition, he denied suicidal/homicidal ideations. He was oriented x 4, with fund of knowledge adequate, memory was intact and there was no impairment of attention and

concentration, but insight and judgment were fair. Diagnosis was adjustment disorder with depression and anxiety, insomnia, and work stress. Sertraline and hydroxyzine were initiated (Tr. 552, 555-556).

When seen for psychiatric evaluation on November 30, 2021, he reported doing well. He stated he was fine when by himself, but stated public events were overwhelming and made him anxious. He denied suicidal/homicidal, psychotic symptoms, and auditory/visual hallucinations but stated his sleep had been "off and on". It was noted he had been prescribed sertraline and hydroxyzine but experienced muscle twitching in his back. He stated it occurred when he was active such as at work, but less so when he was relaxed. He was not sure which caused it, but reported he stopped them two days ago and the symptoms had mostly resolved. However, he did acknowledge those medications had started to help his mood. Mental status examination on this date indicated his grooming was normal, he was cooperative and polite, alert and oriented x 4, with eye contact good, attention and concentration within normal limits, recent and remote memory intact, no abnormal psychomotor activity or movements, his speech and language were normal, with mood "fine", affect calm, appropriate to content and euthymic, thought processes were linear, logical and goal directed, fund of knowledge was average, and judgment and insight were intact (Tr. 346-347, 349-350).

Claimant engaged in a one-month intensive outpatient program for trauma recovery, and while his therapist felt he made progress, Claimant still reported anger and irritability, though there was also some concern that he was not fully compliant with Lexapro. (Tr. 389-91, 504). Claimant also stated he had been working on disability and asked the provider if there was any way he could put in his notes that he was unemployable. It was explained that he had to apply for that increment and ask for unemployability. (Tr. 389-390). Also, mental status examination was unchanged. *Id.*

In early 2022, Claimant continued to report muscle movement and twitching, but noted that these did not interfere with talking, eating, walking, driving, or writing. (Tr. 369, 383). Following an unremarkable brain MRI and neurological examinations, as well as treatment with gabapentin, it was felt the muscle movements were related to anxiety, and more aggressive treatment for anxiety was recommended. (Tr. 358-65, 593-97). In May 2022, Claimant's mental status examination was benign, and clonazepam was added to his regimen of Lexapro. (Tr. 589-90). By August 2022, Claimant reported clonazepam helped with his anxiety and body movements, and he also reported Lexapro was helping him, and the days he was feeling depressed were "few and far between." (Tr. 835). Claimant felt comfortable with his progress, his mental status examination was unremarkable, and his medications were continued without change. (Tr. 835-38). During a September 2022 physical medicine consultative examination, Claimant displayed a tremor of the neck while at rest and tremors of the bilateral upper and lower extremities during testing. (Tr. 798). Claimant reported good mood in November 2022; he reported he socially isolated due to his movement disorder and anxiety but still described himself as "active and functional." (Tr. 817). His mental status examination was again unremarkable, anxiety and depression were described as "stable," and his medications were continued without change. (Tr. 818-20).

In February 2023, Claimant reported feeling anxious in public and around others, but noted his mood was steady, and his activities of daily living were intact. (Tr. 1034). He was future oriented, and medication compliant. *Id.* Once again, his mental status examination was unremarkable, and mirtazapine was added to his medication regimen. (Tr. 1036). This medication was later reduced due to sedation, and bupropion was added for his mood. (Tr. 1020-22).

Claimant continued to improve in May 2023, noting less mood swings and irritability, recently visiting his son in Seattle, and visiting national parks. (Tr. 955). It was noted his motivation and mood had improved, he was able to enjoy leisure, and after finishing insomnia therapy, his sleep was "a lot better." *Id.* Following an unremarkable mental status examination, mirtazapine, Lexapro, and bupropion were continued without change. (Tr. 957-58).

Claimant reported doing "super" in September 2023 with anxiety and depression controlled to the extent they were "in remission." (Tr. 911-14). Though Claimant reported some increase in irritable mood in October 2023, he attributed this to shoulder pain from his arthroscopic surgery a month prior, but he had no other complaints, his mental status examination was normal, and medications were continued. (Tr. 901-04).

The ALJ acknowledged Claimant had been found disabled by the Department of Veterans Affairs however, she noted that "definitions of disability are not the same in all government and private disability programs and government agencies must follow the laws that apply to their own disability programs." (Tr. 30). Therefore, she found a finding by the Department of Veterans Affairs that Claimant is disabled does not necessarily mean that Claimant meets the disability requirements of the Social Security Act. "Regarding this, [the ALJ found] that the 100 percent service-connected rating (7F/13) is inherently not valuable or persuasive." *Id.*

The ALJ also considered Third-Party Function Reports by Cassandra Snider, Claimant's wife, on April 29, 2022, and January 13, 2023. *Id.*

The state agency psychological consultants, Stephanie Crall, Ph.D., and Ryan C. Jones, Ph.D., found Claimant could independently perform simple and detailed tasks that require limited judgment; focus for two-hour periods with routine breaks and pace and persist for eight-hour workdays and 40-hour workweeks despite psychological symptoms; interact with coworkers,

supervisors, and the general public on a superficial basis; and adapt to a work environment with some changes to the environment. (Tr. 83, 91).

Claimant contends, the ALJ failed to comply with SSR 16-3p, leaving the RFC unsupported by substantial evidence. SSR 16-3p requires the ALJ to explain inconsistencies between the Claimant's symptoms and the evidence. The Commissioner contends this is simply a request for the Court to reweigh the evidence to reach a different conclusion. The Court may neither reweigh the evidence nor substitute its judgment for that of the ALJ. *See Hendron v. Colvin*, 767 F.3d 951, 954 (10th Cir. 2014).

Between steps three and four, an ALJ assesses a claimant's RFC, which is the most he can do despite his impairments. 20 C.F.R. §§ 404.1520(a)(4), 404.1545(a)(1), 404.1546(c). Claimant bore the burden of showing that limitations should be included in his RFC assessment. *Howard v. Barnhart*, 379 F.3d 945, 948-49 (10th Cir. 2004). Social Security Ruling (SSR) 96-8p provides, "[t]he RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." 1996 WL 374184, at *3. The issue in this Court's limited review of the agency's decision is whether the correct legal standards were applied and the ALJ's factual findings were supported by substantial evidence.

Claimant first contends that the RFC limitation for frequent reaching with the right upper extremity does not adequately address Claimant's osteoarthritis and tendinopathy of the right shoulder. Claimant faults the ALJ for noting that a few weeks post-arthroscopic right shoulder surgery, he reported he was doing well without significant pain or problems (Tr. 29, 885, 1043), instead asserting that the ALJ did not consider that Claimant was recovering from surgery, advised to stay in a sling, and start physical therapy. However, the ALJ noted Claimant was "healing appropriately," and he was referred to physical therapy. (Tr. 29). Claimant has not demonstrated that the ALJ not mentioning Claimant being in sling influenced the ALJ's findings, as a sling is a standard, temporary, post-surgery

measure, and there is no indication a sling would be permanent. Furthermore, contrary to Claimant's assertion, the ALJ did consider Claimant's complaints in October 2023 that his shoulder hurt quite a bit following surgery and that he was referred to physical therapy. (Tr. 27, 29).

Claimant's argument that the ALJ did not sufficiently explain the RFC limitation for frequent reaching with the right upper extremity in accordance with SSR 96-8p is also unpersuasive. As Claimant acknowledged, the ALJ explained that Claimant's right shoulder arthritis supports limiting his reaching with the right arm to frequent reaching. Yet Claimant argues that frequent reaching is unsupported because Claimant continued to complain of right shoulder pain at an October 2023 psychiatric appointment one month after his surgery and was advised to continue with a sling. (Tr. 885, 901). However, this argument overlooks that Claimant was only one-month post-surgery and still recovering, and that sections 216(i) and 223(d) of the Act define disability as an inability to engage in substantial gainful activity based on impairments that can be expected to last a continuous period of not less than 12 months.

Therefore, an RFC assesses a person's long-term functioning, not functioning in the period immediately recovering from surgery. When the ALJ assessed the RFC in December 2023, Claimant was only three months post-surgery. Based on evidence, the ALJ determined Claimant's healing was progressing well without complication (Tr. 883-85) and that in the long-term, he would still have some limitation based on the imaging showing tendinopathy and arthritis (Tr. 29, 891-92). Thus, the ALJ reasonably limited Claimant to frequent reaching with the right upper extremity. (Tr. 22). This finding is supported by substantial evidence, and the Court should not reweigh this evidence or second-guess the ALJ where her findings of fact are sound and well supported. *Hendron*, 767 F.3d at 954.

Next, Claimant argues the ALJ's assessment of his social interaction limitation was flawed and did not comply with SSR 98-8p. Specifically, Claimant argues the ALJ did not explain how she determined Claimant could occasionally interact with supervisors and coworkers. However, the

treatment records, opinions, and prior administrative medical findings are consistent with and support the ALJ's assessed social limitations. The record includes multiple unremarkable mental status examinations, and with conservative treatment, Claimant's anxiety and depression were "stable" and "in remission." (Tr. 530-31, 555, 589, 818-19, 836, 903-04, 913-14, 957, 1036). *See Bainbridge v. Colvin*, 618 F. App'x 384, 387 (10th Cir. 2015) (finding that treatment including prescription drugs was conservative). The ALJ explained Claimant had a moderate limitation interacting with others based on his reports that he tried to shop in stores when crowds were lowest, he was only comfortable with close family, he needed someone to accompany him going out, and he got very nervous around others. (Tr. 21-23, 220-30). The ALJ further explained that Claimant's embarrassment over his tic disorder, his problematic interactions with others, and his subjective complaints were considered in limiting his social interactions in the RFC, including no working in team or tandem and avoiding the public. (Tr. 32).

Moreover, the state agency psychological consultants found Claimant was able to interact with coworkers, supervisors, and the public on a superficial basis. (Tr. 83, 91). As noted by the Commissioner, while the *Dictionary of Occupational Titles* (*DOT*) does not define "superficial," the ALJ reasonably considered this opinion, and found Claimant to be *more* limited using quantifiable, vocationally relevant terminology in the RFC that precluded all interaction with the public and no working in teams or tandem. (Tr. 22, 30). This objective and opinion evidence supports the ALJ's findings, and no healthcare provider suggested anywhere in the record that Claimant had greater limitations than found by the ALJ. *See, e.g., Howard*, 379 F.3d at 949 ("[T]he ALJ, not a physician, is charged with determining a claimant's RFC from the medical record.").

As to Claimant's argument the ALJ did not address the likelihood of Claimant being involved in verbal altercations, the ALJ specifically considered two instances where Claimant was involved in altercations with others, but explained that these involved a high level of stress as a manager at his former place of employment or at home and were situations that would be outside of the RFC, including

-11-

members of the public using abusive language toward him or arriving on his property unannounced. (Tr. 27-28; *see also* Tr. 22 allowing for simple work, no interaction with the public, and only occasional changes in work setting). The ALJ further explained that these incidents demonstrated poor impulse control, judgment, and coping skills, all of which were considered in arriving at an RFC. (Tr. 28).

At step five, the ALJ found that Claimant could perform the jobs of Sweeper-Cleaner (*DOT* #389.683-010, 1991 WL 673279), Package Sealer (*DOT* #920.685-074 1991 WL 687941), Marker (*DOT* #209.587-034, 1991 WL 671802), Routing Clerk (*DOT* #222.687-022, 1991 WL 672133), and Collator Operator (*DOT* #208.685-010, 1991 WL 671753) (Tr. 33). The *DOT* descriptions of these jobs reflect that they all appear to be solitary in nature, with little social interaction required. All five of the identified jobs list a talking requirement as "not present" and have a people rating of "8" (no significant taking of instructions or helping others), indicating "the lowest possible level of human interaction that exists in the labor force." *Lane v. Colvin*, 643 F. App'x 766, 770, n.1 (10th Cir. 2016). Therefore, Claimant could perform these jobs with very limited to no interaction with coworkers or supervisors.

Finally, Claimant suggests the ALJ improperly compared Claimant's presentations to his treatment providers who observed no tremors to the consultative examination where tremors were prevalent. (Doc. 10 at 22-24). Contrary to Claimant's assertion, the ALJ found the following:

[I]t appears that initially there was some concern that the tremors/involuntary movements might be neurological therefore, he was placed on Gabapentin and told to discontinue psychotropic medications for a time. However, when he again began receiving more aggressive treatment for anxiety, the tremors were somewhat better controlled. The undersigned finds that the claimant did demonstrate tremors/tics at the consultative examination (as discussed below), but it seems reasonable that he could have been more nervous at the consultative examination, rather than when seen by his own providers, as the treatment records overall have been negative for abnormal movements. Therefore, the undersigned finds there appears to have been some improvement in the tremors/tics based on his treatment notes, as well as his mental health symptoms. As noted below, embarrassment and him being self-conscious about the tremors has been considered in limiting

social contact, and it has also been considered in hazard and driving restrictions as well as manipulative limitations. However, his treatment records overall are not consistent with a conclusion that he would additionally require unscheduled breaks or demonstrate significant off task behavior in that regard.

(Tr. 27). Therefore, the Court finds the ALJ did not "explain away" these tremors, and balanced Claimant's presentation at the consultative examination showing moderate-to-severe tremors with evidence observing no involuntary movements. (Tr. 531, 795-98). The ALJ noted the evidence showed Claimant's tremors, while embarrassing, did not interfere with talking, eating, walking, driving, or writing. (Tr. 27, 368). The RFC thus addresses these tremors with upper extremity, environmental, and social limitations, including no interaction with the public. While Claimant argues these limitations did not go far enough, the ALJ properly exercised her discretion as the finder of fact in balancing this evidence and reaching her conclusions. *Richardson v. Perales*, 402 U.S. 389, 399 (1971) (noting, regarding the "not uncommon situation of conflicting medical evidence," that "[t]he trier of fact has the duty to resolve that conflict"); *see also Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1172 (10th Cir. 2012) (ALJ "was free to resolve evidentiary conflicts because there is substantial evidence to support his conclusion").

## IV.    Conclusion

After careful consideration of the record, including review of Claimant's medical records and hearing testimony, the ALJ found that Claimant had severe physical and mental impairments and limited him to a range of medium work with simple tasks, occasional changes in a routine work setting, only occasionally interacting with coworkers and supervisors, and no interaction with the public. Claimant does not demonstrate any basis for remand. Contrary to Claimant's claim, the ALJ appropriately considered and limited Claimant's reaching with the right upper extremity based on his right shoulder impairment. Moreover, the ALJ's reasoning for limiting Claimant to occasional

-13-

interactions with coworkers and supervisors can be reasonably discerned. Overall, Claimant requests this Court consider the same evidence as the ALJ to reach a different conclusion, which is not the role of judicial review. Because substantial evidence supports the ALJ's findings, the undersigned Magistrate Judge RECOMMENDS that the decision of the Commissioner be AFFIRMED. Objections to this Report and Recommendation must be filed within fourteen days. *See* Fed. R. Civ. P. 72(b). Any objections and response shall each be limited to 10 pages and a reply is permitted only with leave of court upon a showing of good cause.

   **IT IS SO ORDERD this 12th day of February, 2025.**

_____

**STEVEN P. SHREDER**
**UNITED STATES MAGISTRATE JUDGE**